# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### BLUEFIELD DIVISION

MICHELLE DILLOW CARTER,

     Plaintiff,

v.                                   CIVIL ACTION NO. 1:19-cv-00191

ANDREW SAUL,[1]
Commissioner of Social Security,

     Defendant.

## PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Michelle Dillow Carter ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. By standing order entered on January 4, 2016, and filed in this case on March 18, 2019, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Claimant's Brief in Support of Complaint (ECF No. 11), the Commissioner's Brief in Support of Defendant's Decision (ECF No. 13), and Claimant's Response to Brief in Support of Defendant's Decision (ECF No. 14).

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d). *See also* 42 U.S.C. § 405(g) (stating that action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 11), **GRANT** the Commissioner's request to affirm his decision (ECF No. 13), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 37 years old at the time of her alleged disability onset date and 40 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 103.)[2] She has a college education. (*Id.* at 99.) Most recently, she worked as a judicial legal secretary, and she has also been employed as a legal office manager and a paralegal. (*Id.* at 284.) Claimant alleges that she became disabled on March 6, 2015,[3] due to bipolar disorder, depression, anxiety, severe mood disorders, endometriosis, and migraines. (*Id.* at 103.)

Claimant filed her application for benefits on April 6, 2015. (*Id.* at 211–12.) Her claim was initially denied on August 28, 2015, and again upon reconsideration on December 15, 2015. (*Id.* at 133–37, 143–49.) Thereafter, on January 13, 2016, Claimant filed a written request for hearing. (*Id.* at 150–51.) An administrative hearing was held before an ALJ on October 24, 2017, in Charleston, West Virginia. (*Id.* at 70–102.) On December 22, 2017, the ALJ entered an unfavorable decision. (*Id.* at 44–58.) Claimant then sought review of the ALJ's decision by the Appeals Council on February 23, 2018. (*Id.* at 206–07.) The Appeals Council denied Claimant's request for review on March 1,

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 8.
[3] Claimant initially gave her disability onset date as March 6, 2014. (Tr. at 103.) However, she later amended the date to March 6, 2015. (*Id.* at 254.)

2019, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 1–7.)

Claimant timely brought the present action on March 15, 2019, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1.) The Commissioner filed an Answer (ECF No. 7) and a transcript of the administrative proceedings (ECF No. 8). Claimant subsequently filed her Brief in Support of Complaint (ECF No. 11), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 13). Claimant then filed her Response to Brief in Support of Defendant's Decision. (ECF No. 14.) As such, this matter is fully briefed and ready for resolution.

### B. *Relevant Medical Evidence*

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

### 1. *Right Shoulder Rotator Cuff Tendonitis Treatment Records*

Claimant presented to the emergency department at Princeton Community Hospital on January 15, 2016, complaining of right shoulder pain because she "fell off a golf cart . . . 7 months ago." (*Id.* at 479.) Upon physical examination, Claimant's shoulder was found to be normal, including her range of motion. (*Id.* at 480.) The emergency department physician suspected that Claimant had a rotator cuff injury and instructed her to see an orthopedic doctor. (*Id.* at 480–81.)

Several weeks later, on February 3, 2016, Claimant presented to physician's assistant Gregory G. Southers, PA-C ("Mr. Southers"). (*Id.* at 482–84.) She explained that in June 2015, she "went to jump on a moving golf cart when the golf cart sped off"

and "[s]he had her right hand on top the [sic] cart and the arm was pulled away from the body." (*Id.* at 482.) She complained that the pain "has been progressively getting worse" and reported "loss of [range of motion], pain that is activity limiting and some nighttime awakening." (*Id.*) Claimant denied "radicular arm symptoms, numbness and tingling." (*Id.*) Upon examination of the shoulder, Mr. Southers found that Claimant "exhibits 150° forward flexion, 120° abduction," was "[u]nable to put [her] thumb on L5 [vertebra] with internal rotation," had "[f]air strength external rotation and thumbs down abduction," and had a "markedly positive" impingement sign. (*Id.* at 484.) Mr. Southers also noted tenderness and pain. (*Id.*) He diagnosed Claimant with right biceps and rotator cuff tendonitis and prescribed "Naproxen and physical therapy." (*Id.*)

On May 3, 2016, Claimant returned to Mr. Southers after completing physical therapy, but his examination findings were largely identical to his earlier findings prior to the physical therapy. (*Id.* at 555.) He ordered an MRI. (*Id.*) Claimant underwent the MRI on September 30, 2016, and it revealed "Supraspinatus tendinopathy with suggestion of small partial tear anteriorly, primarily articular aspect. Edematous changes in the rotator cuff interval, potentially reflecting element of adhesive capsulitis. Anterior distal infraspinatus tendinopathy without tear. Mild effusion, subacromial, subdeltoid and subcoracoid areas, consistent with bursitis." (*Id.* at 557.) Mr. Southers offered Claimant the options of continuing her "conservative care" or having shoulder surgery. (*Id.* at 558.) Claimant requested to "go home and think about the surgery before committing." (*Id.*)

Claimant next saw Mr. Southers on August 4, 2017. (*Id.* at 657–60.) Mr. Southers noted that Claimant "is not interested in surgery." (*Id.* at 657.) Upon examination, Mr. Southers noted limited range of motion, 4/5 strength on external rotation and

supraspinatus, and positive impingement sign.  (*Id.* at 659.)  He recommended physical therapy.  (*Id.* at 660.)

Claimant began physical therapy with Tabatha L. Robins, PT, DPT, ATRIC ("Ms. Robins") on August 21, 2017.  (*Id.* at 618–19.)  Claimant reported to Ms. Robins that she had pain in her right shoulder and that the shoulder was "getting 'worse' because I am not using it."  (*Id.* at 618.)  She reported sleep disruption, being unable to "perform recreational activities" such as bowling and cornhole or do household chores, and being unable to "lift anything heavy" because her "[s]houlder will get 'stuck.'"  (*Id.*)  Ms. Robins noted pain and weakness in Claimant's right shoulder and observed that Claimant "is very guarded with all motions."  (*Id.* at 619.)  Upon examination, Ms. Robins observed decreased range of motion and positive impingement signs.  (*Id.* at 621.)

Claimant continued to receive physical therapy from Ms. Robins regularly.  At Claimant's appointment on August 30, 2017, Ms. Robins observed that Claimant had "visible improvement" in her range of motion.  (*Id.* at 626.)  Still, Claimant continued to report pain, and on September 6, 2017, Ms. Robins remarked that Claimant "avoids any painful movements."  (*Id.* at 632.)  When Ms. Robins reexamined Claimant on September 13, 2017, she noted some improvement in Claimant's range of motion.  (*Id.* at 634.)  Ms. Robins stated that Claimant "remain[ed] pain dominant."  (*Id.*)  When Mr. Southers next saw Claimant on September 15, 2017, he recommended additional physical therapy.  (*Id.* at 664.)

### 2. *Mental Health Treatment Records*

In the years leading up to Claimant's alleged disability onset date, she sought mental health treatment from her primary care provider.  (*See id.* at 395–417.)  Throughout that period, Claimant often complained of depression and side effects

5

associated with her medications, which were changed rather frequently. (*See id.*) Her primary care provider referred her to a mental health provider, and Claimant was first seen by Ira. T. Webb, Jr., PA-C ("Mr. Webb"), a psychiatric physician's assistant, on October 24, 2014. (*Id.* at 423–27.) Mr. Webb's mental status examination of Claimant on that date was largely normal, but he diagnosed Claimant with Bipolar Disorder NOS and Generalized Anxiety Disorder and recommended treatment with medication, with a fair prognosis. (*Id.* at 426–27.)

On March 9, 2015, Claimant presented to Mr. Webb as "depressed, tearful and anxious" and reported that she "had surgery in Jan[uary]" with "numerous complications" and "tried to return to work" but "had a very difficult time." (*Id.* at 441.) Claimant stated that "[h]er boss . . . encouraged her to take some time off" and requested "an excuse." (*Id.*) Mr. Webb performed a mental status examination, which was largely normal, but he made changes to Claimant's medications. (*Id.* at 441–42.) At her next appointment with Mr. Webb on March 20, 2015, Claimant reported that she was "very depressed and moody" and that she had "[l]ost her job." (*Id.* at 443.) Again, Mr. Webb's mental status examination of Claimant was normal, but he added an additional medication. (*Id.* at 443–44.)

Over the next few months, Claimant saw Mr. Webb regularly, and she continued to report feeling angry and depressed. (*Id.* at 445–54.) Her mental status examinations were consistently normal during this time, but Mr. Webb modified her medications at every appointment. (*Id.*) On June 17, 2015, Mr. Webb noted that Claimant "is not having any significant response to any of the meds I've given her." (*Id.* at 455.) Claimant related that she felt "ok" at the remainder of her appointments with Mr. Webb in 2015, and Mr. Webb made fewer changes to her medications. (*Id.* at 459–68.)

On September 30, 2015, Claimant presented to Dr. Michael Crews, D.O. ("Dr. Crews"), complaining, "I'm a mess." (*Id*. at 485.) She related having a "'breakdown' in March" that caused her to lose her job and reported "crying, not sleeping well, racing thoughts," and that she "[s]ometimes does not get out of bed." (*Id*.) She expressed concern with her treatment by Mr. Webb and stated that she "feels like med changes too frequent." (*Id*.) Claimant also reported issues with her concentration and memory. (*Id*. at 486.) Dr. Crews diagnosed Claimant with bipolar disorder and discussed treatment and counseling options with her but did not make changes to her medications. (*Id*. at 487.)

Dr. Crews referred Claimant to counselor Twyla M. Hersman, LPC ("Ms. Hersman"), who evaluated Claimant on December 9, 2015. (*Id*. at 496–99.) Claimant reported "impulsive behaviors," irritability, and "feeling anxious and 'closed in.'" (*Id*. at 496.) She also reported stress associated with losing her job and her bipolar disorder diagnosis. (*Id*.) Upon mental status examination, Ms. Hersman observed that Claimant was "neatly groomed," "appropriately oriented in all spheres," "relates well," and had "above average" intelligence. (*Id*. at 498.) She noted that Claimant's "[m]ood is depressed and anxious with congruent affect" and that her "[s]peech is slightly accelerated." (*Id*.) Ms. Hersman also related that Claimant's "[j]udgment is questionable according to recent behaviors described by [Claimant] (excessive spending; buying large quantities of unnecessary items)." (*Id*.) Ms. Hersman diagnosed Claimant with bipolar disorder. (*Id*. at 499.) She recommended psychotherapy and for Claimant to "be completely compliant with prescriptions . . . and to stay with her current regimen until medications have had time to prove themselves (in)effective before requesting a change." (*Id*. at 498.)

In the meantime, at the recommendations of her former primary care provider and the attorney representing her in her disability matter, Claimant presented to psychiatrist Dr. Philip B. Robertson, M.D. ("Dr. Robertson") on November 18, 2015. (*Id.* at 519–21.) She reported that she was diagnosed with bipolar disorder and experienced frequent mood swings and that she had tried multiple medications that were either ineffective or caused side effects. (*Id.* at 519.) Claimant also related that "she is staying chronically depressed with no recent manic or hypomanic episodes," "has no energy, has lost interests," and "is socially withdrawn." (*Id.*) She further reported that she "is chronically irritable, easily agitated and has difficulty controlling her temper" and that she had poor concentration. (*Id.*) Upon mental status examination, Dr. Robertson observed that Claimant had "a subdued composed demeanor" and had a "moderately depressed" mood "with a stable affect." (*Id.* at 520.) He noted that she had "fair concentration," average intellectual functioning, "coherent, logical, and goal directed" thought, and fair judgment "with some insight." (*Id.* at 520–21.) Dr. Robertson diagnosed Claimant with bipolar disorder, anxiety disorder, and "[p]ossible" post-traumatic stress disorder. (*Id.* at 521.) He noted that Claimant's "current psychotropic medications do not appear to be effective" and made significant changes to her medication regimen. (*Id.*) He also referred Claimant to a psychologist for psychotherapy. (*Id.*) At her next few appointments with Dr. Robertson in December 2015 and January 2016, Claimant met with psychiatric physician's assistant Shanna Autrey, PA-C ("Ms. Autrey"). (*Id.* at 522–24.) Claimant reported feeling "moody," "scattered," "hyper," and "irritable." (*Id.*) She frequently reported experiencing side effects from her medications and made medication changes on her own or requested changes from Ms. Autrey. (*Id.*) Still, her mental status examinations during this period were normal. (*Id.*)

8

On January 21, 2016, Claimant reported to Dr. Crews that she was experiencing mood swings and that she did not like that her medications were changed so frequently. (*Id.* at 502.)  She also reported having "[t]oo much energy" and experiencing memory and concentration issues.  (*Id.*)  Several weeks later, on February 3, 2016, Ms. Hersman observed that Claimant "is slightly less anxious than during previous sessions," and Claimant reported to Dr. Crews on February 18, 2016, that her sessions with Ms. Hersman were "helpful." (*Id.* at 510, 512.)  At her appointment with Ms. Hersman on February 23, 2016, Claimant told Ms. Hersman that she was "feeling down" and "was more forgetful, less focused, more impatient and irritable." (*Id.* at 515.)  She again complained about her medications and related that "she has been considering stopping all of them." (*Id.*)  Ms. Hersman noted that Claimant "is much calmer today than in previous sessions" and stated that "her level of depression appears to be only mild to moderate." (*Id.*)  During this same period, Claimant reported to Ms. Autrey that she was feeling better. (*Id.* at 525–27.)  At her appointment with Ms. Autrey on April 5, 2016, Claimant related that she had modified her medications because she was experiencing side effects and had been feeling depressed, but her mental status examination was normal that day.  (*Id.* at 528.)

On July 19, 2016, Claimant presented to Dr. Robertson's office and stated that she was "crying, being hateful," and "getting angry easily." (*Id.* at 545.)  Her mental status examination was normal, except that her speech was "[e]xcessive." (*Id.*)  Claimant was referred for psychological testing. (*Id.*)  Over the next few months, Claimant continued to complain about side effects from her medications and family stressors.  (*Id.* at 546–49.)  At her appointment on December 7, 2016, Claimant reported to Ms. Autrey that she had gone on a "much needed" family trip to the beach, which she "enjoyed." (*Id.* at 550.)  She related that her "medicine seems to be helping some better," but she "wants

something to give her energy." (*Id.*) Ms. Autrey suggested that Claimant exercise and "bond with her [daughter]." (*Id.*)

At her appointments during the first half of 2017, Claimant continued to report to Ms. Autrey that she experienced side effects with her medications and that she often started or stopped taking medications. (*Id.* at 571–75.) Claimant's mental status examinations were largely normal during this time. (*Id.*) At her appointment with Dr. Crews on March 10, 2017, Claimant complained that Dr. Robertson was changing her medications "every two weeks." (*Id.* at 583.) On April 13, 2017, Ms. Autrey referred Claimant to counseling, but Claimant told Ms. Autrey on June 7, 2017, that she had "[s]topped going." (*Id.* at 573, 575.) Ms. Autrey referred Claimant to a different counselor on August 9, 2017. (*Id.* at 654.) At her appointments that day and on September 27, 2017, Claimant complained to Ms. Autrey of "cognitive cloudiness," falling often, increased agitation, and "just want[ing] to lay in bed." (*Id.* at 654–55.) Claimant's mental status examinations at both appointments were normal. (*Id.*) Ms. Autrey directed Claimant to "[t]ry to cut back on any unnecessary meds." (*Id.* at 654.)

   3. *Opinion Evidence*

      a. *Elizabeth Jennings, M.A.*

Psychologist Elizabeth Jennings, M.A. ("Ms. Jennings") performed a consultative psychological evaluation of Claimant on December 9, 2015. (*Id.* at 469–73.) Claimant reported to Ms. Jennings that she suffered from "bipolar disorder, depression, anxiety, mood disorder, endometriosis, migraines, thyroid problems, and excessive weight gain." (*Id.* at 470.) She further related that "her concentration is very poor" and that "she cannot stand to be around the public and has difficulty making up her mind." (*Id.*) Claimant also told Ms. Jennings that she was "really restless" at night and "ha[d] frequent crying

spells and racing thoughts" and low energy. (*Id.*) She reported panic attacks, "frequent nightmares," and "voices telling her bad things about herself." (*Id.*) In addition, Claimant told Ms. Jennings that she was previously fired from her job, "would just lose control at work," "cry and be mean to people," and "show up late and leave early." (*Id.* at 471.)

Upon mental status examination, Ms. Jennings observed that Claimant had a "[n]eat appearance" and a "cooperative attitude" and was properly oriented. (*Id.*) She noted that Claimant's "[s]peech was normal in tone, but quite pressured in nature" and that her mood was "manic" and her affect "commensurate with anxiety" because "[s]he spoke quite rapidly and was quite emotional." (*Id.*) Ms. Jennings also related that Claimant's "[s]tream of thought was somewhat tangential in nature." (*Id.*) The remainder of the mental status examination findings were unremarkable, and Ms. Jennings observed that Claimant's insight and judgment, memory, and concentration were normal. (*Id.* at 471–72.)

When addressing Claimant's social functioning, Ms. Jennings noted Claimant's "significant rapid speech" and "anxious . . . facial expressions and trembling." (*Id.* at 472.) She also related, "[Claimant] spontaneously generated conversation, but would ramble at times and had to refocus on the question at hand." (*Id.*) Ms. Jennings further stated that Claimant self-reported that she was "doing awful," "used to be quite social and would do things for other people," had quit driving, and was unable to "keep up with the bills." (*Id.*) Claimant also told Ms. Jennings that she did not leave the house due to her compulsive shopping, that her daughter and husband "help [her] get up" out of bed, and that her daughter "does the laundry and takes care of the dogs." (*Id.*)

Ms. Jennings diagnosed Claimant with bipolar disorder based on her previous diagnoses and treatment, including medication and "intensive outpatient services." (*Id.*)

She also diagnosed Claimant with panic disorder based on Claimant's "report of panic attacks occurring situationally as well as out of the blue" and Claimant's "quite anxious" behavior "during the assessment."  (*Id.*)  She diagnosed Claimant with post-traumatic stress disorder based on Claimant's "history of frequent nightmares, hypervigilance, and trigger events" as well as her history of "severe sexual abuse as a young child."  (*Id.*)  Finally, Ms. Jennings diagnosed Claimant with somatic symptom disorder based on Claimant's "report of increasing migraine headaches and endometriosis."  (*Id.*)  Ms. Jennings concluded that Claimant's "prognosis is guarded with available support."  (*Id.*)

      *b. Dr. Stephen Nutter, M.D.*

On November 19, 2015, Dr. Stephen Nutter, M.D. ("Dr. Nutter") performed a consultative medical examination of Claimant.  (*Id.* at 474–78.)  Claimant complained to Dr. Nutter of her psychological difficulties and her migraine headaches.  (*Id.* at 474.)  To that end, Dr. Nutter observed that Claimant had normal intellectual functioning, was "able to hear and understand conversational voices without difficulty," and had good "[r]ecent and remote memory for medical events."  (*Id.* at 476.)  His neurological exam of Claimant was normal "with no focal deficits or abnormalities noted," but he diagnosed Claimant with migraine headaches.  (*Id.* at 477.)

Claimant also reported to Dr. Nutter that she had felt "constant" pain in her right shoulder and elbow over the previous six months after falling while "tr[ying] to jump on to golf car that was moving" but "ha[d] not seen anybody really to have it evaluated yet." (*Id.* at 475.)  She represented that "reaching, lifting, pushing, pulling, and using the arms overhead will increase the shoulder and elbow pain."  (*Id.*)  Dr. Nutter observed "pain and tenderness in the right shoulder and right elbow" but "no redness, warmth, swelling, or nodules."  (*Id.* at 476.)  He noted "a little bit of decrease [sic] range of motion of the right

shoulder" but normal grip strength. (*Id*. at 476–77.) Dr. Nutter related that Claimant "is able to write and pickup [sic] coins with either hand without difficulty." (*Id*. at 476.) He diagnosed Claimant with a right shoulder and elbow sprain. (*Id*. at 477.)

### c.  *Dr. L. Andrew Steward, Ph.D.*

Dr. Robertson referred Claimant to psychologist Dr. L. Andrew Steward, Ph.D. ("Dr. Steward") for a psychological evaluation, which Dr. Steward conducted on January 30 and February 13, 2017. (*Id*. at 559–69.) Upon mental status examination, Dr. Steward observed that Claimant's "affect was constricted and her mood was anxious and dysphoric." (*Id*. at 560.) The remainder of the mental status examination was unremarkable, and Dr. Steward noted that Claimant's "thought content and organization were not impoverished or confused," her "mental functions, including fund of information, judgment, abstract reasoning, ability to perform calculations, and attention and concentration fell within average to above ranges," and her "memory functions . . . fell above average." (*Id*.)

Claimant reported to Dr. Steward that "she drives [her husband] crazy" and "is snappy, hateful, moody, and mean." (*Id*.) She related arguing with her husband "over their daughter . . . who acts like [Claimant], is very anxious, and very spoiled." (*Id*.) Claimant also told Dr. Steward that she "argues with [her daughter] all the time because she doesn't want to do chores and look after the dog, and [Claimant] does everything." (*Id*.) She reported "loving to shop . . . and going to the lake in the summer," doing crafts and bowling, although "she used to bowl more until she hurt her shoulder and she used to be more active." (*Id*.) She also told Dr. Steward that "[s]he does not have a real interest in people and things and doesn't want to be around people." (*Id*.) Claimant related feeling "nervous," "irritable," and "depressed," having trouble sleeping and experiencing

nightmares, not wanting to get up in the morning, and that "[h]er memory and concentration are awful." (*Id.* at 561.)

After conducting a series of tests, Dr. Steward summarized his findings. (*Id.* at 564–68.) He found that Claimant's IQ "fell at the high end of the average range" and that she had average or above average intellectual abilities. (*Id.* at 564–65.) He concluded that she had "severe anxiety" based on her reports of feeling nervous, dizzy, unsteady, and shaky, among other behaviors, and "severe depression" based on her reports of feeling irritable, tired, and worthless, losing interest in activities, difficulty making decisions, and sleeping more than usual, among other behaviors. (*Id.* at 565.) When discussing the results of Claimant's personality test, Dr. Steward pointed out that Claimant "was significantly elevated in . . . the somatic complaints, anxiety, anxiety-related disorders, depression, paranoia, schizophrenia, borderline tendencies, aggression, and stress scales." (*Id.*) He remarked that on a different test, Claimant "rated herself in the very much above average range in inattention/memory problems, impulsivity/emotional lability, problems with self-concept, DSM-IV inattentive symptoms, DSM-IV ADHD symptoms total, and ADHD index" and "as above average in DSM-IV hyperactive-impulsive symptoms." (*Id.* at 566–67.) He noted that Claimant's husband and daughter rated her "in the very much above average range in inattention/memory problems, impulsivity/emotional lability, DSM-IV inattentive symptoms, DSM-IV hyperactive-impulsive symptoms, DSM-IV ADHD symptoms total, and ADHD index" and "as much above average in problems with self-concept and slightly above average in hyperactivity/restlessness." (*Id.* at 567.)

Dr. Steward diagnosed Claimant with bipolar I disorder, generalized anxiety disorder, obsessive-compulsive disorder, attention-deficit/hyperactivity disorder, and

post-traumatic stress disorder.  (*Id.* at 568.)  He opined that Claimant "does appear permanently and totally disabled from any time of gainful employment."  (*Id.* at 569.)  Dr. Steward further noted, "Prognosis appears poor for large gains in behavior and [Claimant] should remain in psychotherapeutic intervention."  (*Id.*)

### d.  Dr. Robertson and Ms. Autrey

Dr. Robertson and Ms. Autrey completed a series of interrogatories about Claimant's mental functioning on September 25, 2017.  (*Id.* at 641–44.)  In those interrogatories, Dr. Robertson and Ms. Autrey opined that Claimant satisfied Listings 12.04, 12.06, and 12.08 from 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 641.)  Dr. Robertson and Ms. Autrey further opined that Claimant had moderate restrictions of activities of daily living; extreme difficulty in maintaining social functioning; extreme difficulty in maintaining concentration, persistence, or pace; and marked repeated episodes of decompensation.  (*Id.* at 642.)  Dr. Robertson and Ms. Autrey stated, "[Claimant] demonstrates no useful ability to function in a social setting or with tasks requiring focus and concentration.  Even her family is often unable to tolerate her agitation and irritability resulting from her affective disorder, anxiety disorder and personality disorder."  (*Id.*)  They summarized that Claimant "has demonstrated minimal improvement" and was taking "multiple medications with limited efficacy" and "poor tolerability" of side effects, which Dr. Robertson and Ms. Autrey remarked "could potentially interfere with [Claimant's] ability to function in a workplace setting on a regular 8 hour day 5 day per week schedule."  (*Id.* at 643–44.)  They described Claimant's prognosis as "poor" and opined that she would be absent from work three or more days per month.  (*Id.*)

Counselor Kathy Wyrick, M.A., LPC ("Ms. Wyrick") reviewed Dr. Robertson's and Ms. Autrey's interrogatory responses. (*Id.* at 648.) Ms. Wyrick stated, "I agree with the assessment and endorse the findings of Dr. Robertson and Ms. Autrey's limitations of [Claimant]." (*Id.*)

### e. Dr. James Binder, M.D. and Dr. Curtis Withrow, M.D.

State agency medical consultant Dr. James Binder, M.D. ("Dr. Binder") reviewed Claimant's application for benefits on August 27, 2015, and, when addressing Claimant's RFC, concluded that Claimant's physical "conditions cause non severe functional limitations." (*Id.* at 109.) Upon reconsideration on December 2, 2015, state agency medical consultant Dr. Curtis Withrow, M.D. ("Dr. Withrow") agreed with Dr. Binder's conclusions. (*Id.* at 126.)

### f. Dr. Paula J. Bickham, Ph.D. and Dr. Joseph Richard, Ed.D.

State agency psychological consultant Dr. Paula J. Bickham Ph.D. ("Dr. Bickham") reviewed Claimant's application for benefits on August 21, 2015, and conducted a mental RFC assessment. (*Id.* at 110–12.) Dr. Bickham found that Claimant had moderate limitations in understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; and "complet[ing] a normal workday and workweek without interruptions from psychologically based symptoms and . . . perform[ing] at a consistent pace without an unreasonable number and length of rest periods." (*Id.* at 110–11.) Dr. Bickham further found that Claimant was moderately limited in her abilities to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (*Id.* at

111.)  Dr. Bickham concluded that Claimant "retains the ability to learn and perform routine one to three task work like activities with superficial contact [with] others." (*Id.* at 112.)  Upon reconsideration on December 15, 2015, Dr. Joseph Richard, Ed.D. ("Dr. Richard") reviewed Dr. Bickham's findings and affirmed them "as written." (*Id.* at 129.)

### 4.  Claimant's Hearing Testimony

At her hearing before the ALJ held on October 24, 2017, Claimant testified that she was fired from her job in March 2015 due to her "poor judgment." (*Id.* at 80.)  She claimed that she had "a mental breakdown." (*Id.* at 94.)  Claimant explained that during the last "six to eight months" of her employment, her "behavior . . . sporadically changed," and she was experiencing "crying spells, not getting along with others, just not concentrating, absence at work." (*Id.* at 80.)   She related that she "isolated [her]self" and "would just close [her] office and not really speak to anyone," and that her "work began to fall short of what was expected." (*Id.*)   Claimant stated that she "was just not a productive employee." (*Id.* at 81.)  When the ALJ asked Claimant what prevented her from being a productive employee, Claimant explained that she was confused, forgetful, unable to focus, did not get along with others, had "crying spells," and was "very medicated." (*Id.* at 82.)  She estimated that she had "been on around 80 medications" since "the end of 2002/beginning of 2003." (*Id.* at 84.)

When describing the effects of her bipolar disorder, Claimant testified that she was "either extremely high with a hundred thoughts running through [her] mind at the same time" and would "start something and not finish[] it" or she would "lay in bed for . . . a week at a time." (*Id.* at 87.)  She explained that she is "flying off the handle or . . . crying constantly." (*Id.* at 89.)  She also stated that she "need[ed] to be in control of how things are done" or she would "get . . . angry and have outbursts of . . . being hateful and shouting

at people." (*Id*. at 89–90.)  As to her anxiety symptoms, Claimant related that she had "been advised by [her] psychiatrist not to drive" because she became confused or would get lost, "go off curves, swerve in traffic, [and] not pay attention." (*Id*. at 90.)  And she testified that her post-traumatic stress disorder caused her to have "flashbacks" and "nightmares." (*Id*. at 90–91.)

Claimant further testified that she did not have hobbies, friends, or "a social life" and she "quit going to church." (*Id*. at 93.)  She told the ALJ that she did not cook or clean. (*Id*.)

### 5. Vocational Expert Hearing Testimony

At the hearing, the ALJ employed a vocational expert ("VE") to aid him in determining whether Claimant could perform her past relevant work or other work. (*See id*. at 98–102.)  The ALJ asked the VE to classify Claimant's past relevant work, and the VE testified that Claimant's previous jobs were all sedentary work. (*Id*. at 99.)  The ALJ next asked the VE if a hypothetical individual "limited to medium work," "frequent reaching with the right dominant arm," and "occasional interaction with the public" could perform Claimant's past relevant work. (*Id*. at 100.)  The VE testified that the hypothetical individual could perform some of Claimant's past relevant work. (*Id*.)  The ALJ asked the VE how often a secretary would have to interact with the public, and the VE responded, "Occasional." (*Id*.)

Then, the ALJ asked the VE if the hypothetical individual he had asked about previously could perform other work. (*Id*. at 100.)  The VE answered that such an individual could work as a janitor, kitchen helper, or stock clerk. (*Id*. at 100–01.)  Finally, the ALJ asked the VE if a hypothetical individual with "the same limitations as the first hypothetical, but would be off task for more than 15 percent of the time in an eight-hour

18

workday" was capable of Claimant's past relevant work or other work.  (*Id.* at 101.)  The VE replied that the second hypothetical individual would not be capable of doing those jobs.  (*Id.*)  Claimant's representative also asked the VE if the other jobs she listed required the use of both hands, and the VE responded that they did.  (*Id.*)

### 6.  *Additional Records Submitted to Appeals Council*

#### a.  *Interrogatory Responses from Dr. Robertson and Ms. Autrey*

On March 12, 2018, Ms. Autrey submitted an additional set of interrogatory responses intended to address portions of the ALJ's written decision.  (*Id.* at 8–13.)  When asked whether her "opinion as to the extent and severity of [Claimant's] mental impairments [would] be contraindicated by [Claimant] taking a trip," Ms. Autrey responded that Claimant "is encouraged to take trips with her family as she is able to tolerate them" but nonetheless reiterated that Claimant's "psychiatric impairments significantly limit her out of home activities."  (*Id.* at 11.)  Ms. Autrey explained, "When [Claimant] does commit to a family vacation, she does so because she is insightful enough to realize that it is healthy for her family dynamics and her own mental health." (*Id.*)  She stated that such vacations "are definitely not typical" and that Claimant "is still very avoidant and secludes herself to her place of residence for the majority of her trip."  (*Id.*)

When asked to elaborate on her opinion that Claimant's mental impairments caused more than "mild" limitations, Ms. Autrey indicated that Claimant suffered from "extreme" limitations in social functioning because "she is significantly self-isolated, has no social life or friends, stopped going to church, has strained relationships with family and even has demonstrated her difficulty communicating with office staff and times due to her irritability."  (*Id.*)  And in addressing Claimant's "extreme" limitations in maintaining concentration, persistence, or pace, Ms. Autrey stated, "[Claimant's] focus

and concentration are poor, making it difficult for her to complete simply, everyday tasks such as housework, paying bills or even reading a book. She has recently voluntarily quit driving at the urging of her husband and daughter as her concentration and focus has become so limited that they are all concerned that her driving is a risk to herself and others." (*Id.*) Ms. Autrey continued, "It is well documented in medical records that [Claimant] has recurrent and significant decompensations of extended duration." (*Id.*)

Next, Ms. Autrey was asked to respond to the ALJ's finding that the side effects from Claimant's medications would not significantly interfere with her ability to work. (*Id.*) Ms. Autrey stated that Claimant "has been tried on numerous medication regimens and requires frequent adjustments in medications due to intolerances. . . . She has yet to be on a combination of medications that provide adequate symptom management without adverse effects that would allow her to engage in substantial gainful activity 8 hours/day, 5 days/week." (*Id.* at 11–12.)

Ms. Autrey also responded to a series of questions about Dr. Steward's examination. (*Id.* at 12–13.) First, Ms. Autrey explained that Dr. Steward's "role was to administer psychological testing that was quite intensive to provide objective evidence that was either supportive of or contradictory to the working diagnoses set forth by the psychiatric providers that had examined [Claimant] up until that time." (*Id.* at 12.) She stated that Dr. Steward's "testing did in fact provide supportive evidence of multiple diagnoses established at the time of [Claimant's] initial evaluation by Dr. Robertson on March 14, 2017," and "of additional diagnoses." (*Id.*) Ms. Autrey further explained that Dr. Steward's testing revealed issues with Claimant's memory and concentration due to her diagnoses: "The fact that [Claimant] has MULTIPLE diagnoses only makes the detrimental impact on memory and concentration more pronounced." (*Id.* (emphasis in

original).)  Ms. Autrey also indicated that she "agree[d] with Dr. Steward that [Claimant] has a poor prognosis and is considered to be permanently and totally disabled from any type of gainful employment due to her multiple psychiatric diagnoses." (*Id.*)  And lastly, when responding to a question about the ALJ's rejection of Dr. Stewards report because of a lack of objective evidence, Ms. Autrey answered, "The testing that Dr. Steward performed provides the most objective evidence that one can get in Psychiatry." (*Id.*)

Finally, Ms. Autrey was asked about Ms. Jennings's consultative examination. (*Id.* at 13.)  Ms. Autrey stated that Ms. Jennings's findings were consistent with Dr. Robertson's and Ms. Autrey's prior interrogatory responses, explaining that Claimant's "symptoms are very consistent throughout all provider reports" and that "[m]ental status exams are not necessarily expected to be static [over time] as they are a function of the stability of the psychiatric conditions at that time, which can be influenced by medication regimens, stressors, etc." (*Id.*)  Ms. Autrey also stated that Ms. Jennings's findings were consistent with Dr. Steward's findings: "[Claimant's] report of symptoms is consistent across providers as are mental status exams, thus the consistence in diagnoses including bipolar disorder and multiple anxiety disorders." (*Id.*)

Dr. Robertson indicated that he agreed with Ms. Autrey's responses. (*Id.*)

### b. *Physical Therapy Records*

On October 9, 2017, Claimant's physical therapist noted that Claimant "experienced a fall three weeks ago that has made her shoulder feel worse" and "reports still having trouble with all activities that she did in evaluation." (*Id.* at 65.) Claimant reported that she experienced "[s]harp pains with movement, aching/soreness with no movement." (*Id.*)  Upon examination, Claimant's range of motion was decreased compared to the previous examination on September 13, 2017. (*Id.* at 66.) Two days later,

Claimant reported that her right shoulder "is sore, but may be better." (*Id.* at 68.) Her physical therapist noted "[s]everal large 'pops' heard while performing [passive range of motion testing]" and "[j]oint integrity with a 'soft end feel' today." (*Id.* at 69.) The physical therapist rated Claimant's "Rehab Potential" as good. (*Id.*)

On January 8, 2018, Claimant's physical therapist noted "[d]ecreased mobility and strength." (*Id.* at 16.) Claimant reported that she "avoids any motion that produces pain," and her "[f]amily performs all physical tasks for [her]." (*Id.*) Ms. Robins "encouraged [Claimant] to use [her] right shoulder within uncomfortable stretch area in order to gain mobility." (*Id.*) At her appointment on January 16, 2018, Claimant reported that "her shoulder hurts when she tries to raise it straight forward and hurts the most when she brings it up to the side." (*Id.* at 20.) She also told her physical therapist that she "is unable to dress herself [and] fix her hair independently due to shoulder pain." (*Id.*) Claimant reported "she feels 'popping' in the shoulder with certain movements approaching or surpassing 90 degrees of flexion or abduction" on January 25, 2018. (*Id.* at 22.) Her physical therapist observed that she was "able to relax more" and her mobility had improved. (*Id.* at 23.)

Claimant's reports to her physical therapist during February 2018 were largely the same as in January of that year. (*See id.* at 27–34.) Claimant stated that her shoulder continued to hurt, and she didn't use it much because of that. (*Id.* at 27.) She also stated, "I hate when it pops." (*Id.*) The physical therapist noted less "popping" when she applied "light resistance." (*Id.* at 28, 30.) However, the physical therapist observed that Claimant had difficulty relaxing and engaged in "muscle guarding" to prevent movement. (*Id.* at 28, 32, 34.) On February 21, 2018, Claimant related that her shoulder hurt because she fell on a wooden deck and landed on her right side. (*Id.* at 33.)

22

On March 2, 2018, Claimant reported that her arm had "not [gotten] better" since she initially injured it. (*Id.* at 35.) The physical therapist noted that she "has made minimal to no progress secondary to PT treatment, as [Claimant] reports that she does not use [her right arm] for much of anything . . . because 'it hurts.'" (*Id.* at 37.) The physical therapist encouraged Claimant to "try[] to use [her arms] in order to avoid adhesive capsulitis." (*Id.*) Claimant was "[d]ischarge[d] as minimal to no progress has been made." (*Id.* at 41.)

*C. Sequential Evaluation Process*

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i),

416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments.  *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  The ALJ gleans this information from the available medical evidence.  *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001).  An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled."   20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).   "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'"  *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step.  *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e).  The claimant's RFC reflects "her ability to perform work despite her limitations."  *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation

24

marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through the date of the decision. (Tr. at 49.) He further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability. (*Id.* at 49−50.) He found that Claimant's right shoulder rotator cuff tendonitis, bipolar disorder, depressive disorder, and anxiety disorder constituted "severe" impairments. (*Id.* at 50.) However, he found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 50−52.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to

perform medium work . . . except [she] may frequently perform reaching with the right dominant upper extremity." (*Id.* at 52.) In addition, the ALJ found that Claimant "is limited to occasional interaction with the public." (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, she was unable to perform her past relevant work. (*Id.* at 57.) He noted that Claimant is "a younger individual" with "at least a high school education" and that "[t]ransferability of job skills [was] not material to the determination of disability." (*Id.*) Because the ALJ determined that Claimant was unable to perform the full range of medium work, he enlisted a VE to aid in his finding that Claimant is capable of working as a janitor, kitchen helper, or stock clerk. (*Id.* at 57–58.) As a result, the ALJ concluded that Claimant was not "under a disability . . . from March 6, 2015, through the date of this decision." (*Id.* at 58.)

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh

conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence.  *Id.* (quoting *Craig*, 76 F.3d at 589).

### III.    ANALYSIS

Claimant's arguments are numerous.  (ECF No. 11 at 8–20.)  She argues that the ALJ improperly assessed her RFC (*id.* at 8–9), erroneously evaluated her credibility (*id.* at 9–12), improperly evaluated opinion evidence (*id.* at 12–17), and disregarded the VE's testimony (*id.* at 17–18).  She further contends that the Appeals Council improperly failed to remand her case despite new evidence presented to it.  (*Id.* at 18–20.)  Claimant asks this Court to reverse the Commissioner's decision and award her benefits.  (*Id.* at 20.)  The Commissioner responds that Claimant improperly challenges the ALJ's factual findings (ECF No. 13 at 6) and that the ALJ adequately explained his RFC assessment (*id.* at 7–10), correctly evaluated Claimant's credibility (*id.* at 10–13), properly weighed the medical opinion evidence (*id.* at 13–15), and permissibly relied on the VE's testimony (*id.* at 15–17).  He further argues that the evidence Claimant submitted to the Appeals Council did not necessitate remand.  (*Id.* at 17–18.)  Claimant replies, essentially, that the Commissioner's response did not engage with her arguments but instead repeats the ALJ's erroneous analysis.  (ECF No. 14.)

### A. *RFC Assessment*

Claimant's arguments with respect to the ALJ's RFC assessment are threefold: first, she contends that the ALJ erroneously determined that Claimant could frequently reach with her right arm and that this conclusion was not supported by any evidence;

28

second, she argues that the ALJ failed to perform a function-by-function analysis; and third, she argues that the ALJ did not evaluate Plaintiff's mental limitations. (ECF No. 11 at 8–9.)

As to Claimant's first argument, the ALJ adequately explained his finding that Claimant could frequently reach with her right arm. When conducting the RFC assessment, "the ALJ uses all the relevant evidence, medical or otherwise, to determine a claimant's 'ability to meet the physical, mental, sensory, and other requirements of work.'" *Ladda v. Berryhill*, 749 F. App'x 166, 172 (4th Cir. 2018) (quoting 20 C.F.R. §§ 404.1545, 416.945). The "RFC assessment 'must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." *Id.* (quoting SSR 96-8p (July 2, 1996)). Here, the ALJ reviewed the medical evidence related to Claimant's right shoulder as well as Claimant's statements about her symptoms. (Tr. at 6–7.) In particular, the ALJ noted that Claimant first sought treatment on November 19, 2015, six months after she claimed she injured her shoulder, and upon examination "her range of motion was only a little decreased" and her "muscle strength . . . was normal." (*Id.* at 7.) He then noted that in January and February 2016, examinations of Claimant's right shoulder indicated some restriction in her range of motion, and she was prescribed medication and physical therapy to treat the shoulder. (*Id.*) Finally, the ALJ noted that although Claimant continued to report right shoulder pain in late 2016 and 2017 and her range of motion was decreased, she declined to undergo shoulder surgery and had "some improvement" with physical therapy. (*Id.*) The ALJ reasoned that Claimant's "symptoms must be fairly well controlled with conservative treatment" and concluded that she "is capable of performing medium exertion with reaching limitation." (*Id.*)

Put simply, "the ALJ . . . used evidence from the record to explain his finding," *Ladda*, 749 F. App'x at 172, and Claimant's argument to the contrary is without merit.  To the extent Claimant asserts that the ALJ improperly disregarded evidence of her disability (*see* ECF No. 14 at 1–2), "[t]he duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court."  *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996) (citing *Kasey v. Sullivan*, 3 F.3d 75, 79 (4th Cir. 1993)).  As long as substantial evidence supports the ALJ's findings—which it does here—those findings will not be disturbed.  *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996))).

Turning next to Claimant's second argument, the ALJ adequately discussed the evidence to support his finding that Claimant had the RFC to perform medium work.  Prior to determining a claimant's RFC, the ALJ must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions listed in the regulations."  *Lewis v. Berryhill*, 858 F.3d 858, 862 (4th Cir. 2017) (quoting *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015)).  Although the ALJ need not "discuss functions that are 'irrelevant or uncontested,'" *Mascio*, 780 F.3d at 636, "remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review," *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016) (quoting *Mascio*, 780 F.3d at 636).

Claimant argues that the ALJ did not consider her "ability to bilaterally lift 50 pounds," as would be occasionally required in order to perform medium work. (ECF No. 11 at 8.) She points to her physical therapy records, which she claims show that she was unable to "use her right shoulder to get dressed and fix her hair." (*Id.*) Bearing in mind that neither dressing herself nor styling her hair call into question whether Claimant was capable of lifting more than a minimal amount of weight, those very same records indicate that Plaintiff reported to her physical therapist on September 5, 2017, "that her shoulder is 'hurting more' . . . [due to] *carrying a heavy tote* upstairs to decorate for fall." (Tr. at 629 (emphasis supplied).) It is incongruous for Claimant to assert that her ability to lift heavy items is at issue and should have been addressed by the ALJ when the available evidence reveals that she lifted heavy items.[4] Accordingly, the ALJ did not err by failing to discuss it. *Mascio*, 780 F.3d at 636 ("[R]emand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'"); *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) ("Preparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary."); *see Depover v. Barnhart*, 349 F.3d 563, 567 (8th Cir. 2003) ("[A]ll of the functions that the ALJ specifically addressed in the RFC were those in which he found a limitation, thus giving us some reason to believe that those functions that he omitted were those that were not limited.").

Finally, Claimant argues that the ALJ did not engage in a functional analysis with respect to her claimed mental limitations. (ECF No. 11 at 9.) Specifically, the ALJ's RFC

---

[4] The fact that lifting may have caused Plaintiff pain is immaterial because "disability requires more than mere inability to work without pain." *Clemens v. Astrue*, No. 3:11-cv-599-MOC-DSC, 2012 WL 1698293, at *4 (W.D.N.C. Apr. 24, 2012) (quoting *Ferrante v. Bowen*, 869 F.2d 593 (4th Cir. 1989) (table), 1989 WL 14408, at *4).

assessment must take into account a claimant's abilities to "understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p, 1996 WL 374184 (July 2, 1996). But again, the ALJ has no obligation to explicitly "discuss functions that are 'irrelevant or uncontested.'" *Mascio*, 780 F.3d at 636. Here, the ALJ first addressed Claimant's mental impairments at step three of the sequential evaluation process, ultimately concluding that claimant had "mild limitation[s]" in understanding, remembering, or applying information; concentration, persisting, or maintaining pace; and adapting or managing oneself and "a moderate limitation" in interacting with others. (Tr. at 51.) Although this analysis "is not a substitute for the RFC assessment," *Tanner v. Colvin*, No. 4:15-cv-27-FL, 2016 WL 626493, at *8 (E.D.N.C. Jan. 26, 2016), *adopted by* 2016 WL 617431 (Feb. 16, 2016)— which the ALJ acknowledged (Tr. at 51)—it may help to illustrate which work-related functions require more detailed treatment in the RFC assessment, *see Bryan v. Berryhill*, No. 1:17-cv-00071-MR, 2018 WL 2324440, at *5 (W.D.N.C. May 22, 2018) (finding that ALJ required to explain "whether [moderate] limitation translated into any actual functional limitations").

In conducting the RFC assessment, the ALJ first described Claimant's hearing testimony, which included complaints of confusion and forgetfulness, inability to "get along well with others," and "stay[ing] in bed a lot." (Tr. at 52.) The ALJ then stated that Claimant's statements about her impairments "are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.*) He summarized Claimant's mental health treatment records, noting in particular the relatively frequent changes in Claimant's medications but largely normal

32

mental status examinations.  (Tr. at 53–55.)  He then explained that this evidence indicated that Claimant was capable of "engaging in competitive work activity, with consideration of the additional functional limitations described above [occasional interaction with the public]."  (*Id.* at 55.)  Next, the ALJ considered the opinion evidence, giving "partial weight" to the opinions of Claimant's treating mental health providers, Dr. Robertson and Ms. Autrey, because "treatment records and psychological testing . . . consistently indicate good memory, good concentration, and that [Claimant] interacted well with others."  (*Id.*)  He gave "little weight" to evaluating psychologist Dr. Steward's opinion because "objective testing . . . showed above average intelligence, good ability to concentration [sic], and no significant deficits in memory."  (*Id.* at 56.)  The ALJ similarly accorded "little weight" to the evaluations of the state agency psychological consultants, Dr. Bickham and Dr. Richard, because "there no [sic] objective evidence to support [that Claimant] is limited to simple work," as Claimant "exhibited no significant limitations . . . reported she is able to follow instructions," and "the undersigned observed no difficulties with concentration" at the hearing.  (*Id.*)

Although "an explicit function-by-function analysis of Claimant's limitations" is clearly preferable to this extensive review of the available evidence, remand is not required where the record, "as discussed by the ALJ, provides a significant basis to meaningfully review the ALJ's RFC conclusions."  *Geissler v. Berryhill*, No. 2:16-cv-06590, 2017 WL 3598787, at *6 (S.D.W. Va. July 31, 2017) (quoting *Ashcraft v. Colvin*, No. 3:13-cv-00417-RLV-DCK, 2015 WL 9304561, at *7 (W.D.N.C. Dec. 21, 2015)), *adopted by* 2017 WL 3599193 (Aug. 21, 2017).  The ALJ's review of the evidence in this case indicates that Claimant's mental status examinations were largely normal, objective findings regarding her memory and concentration were unremarkable, and she continued

33

to engage in activities of daily living. (Tr. at 53–55.) However, the ALJ was clearly concerned by Claimant's testimony that she "lost her job [because] her behavior had changed" and she was unable to "get along well with others" at work. (*Id.* at 52.) Notably, in support of her argument for remand, Claimant "does not point to contradictory evidence within the record" that would render her unable to perform job-related mental functions, "but merely the purported absence of an explanation." *Morrison v. Berryhill*, No. 1:17-cv-00218-RJC, 2018 WL 4440715, at *6 (W.D.N.C. Sept. 17, 2018). (*See* ECF No. 11 at 9; ECF No. 14 at 2.) "Where, as here, the ALJ has included a specific restriction that facially addresses 'moderate' . . . limitation in the claimant's [mental abilities] . . . further explanation by the ALJ" is not required "absent some evidentiary showing by the claimant . . . that he or she cannot perform [competitive] work because of his or her particular . . . deficits." *Grant v. Colvin*, No. 1:15-cv-00515, 2016 WL 4007606, at *9 (M.D.N.C. July 26, 2016). Claimant has not made that showing here.

In sum, the undersigned **FINDS** that the ALJ's RFC assessment of Claimant is supported by substantial evidence.

### B. *Claimant's Credibility*

Claimant next argues that the ALJ failed to properly assess her credibility. (ECF No. 11 at 9–12.) Specifically, she asserts that the ALJ "did not identify any testimony that was inconsistent with medical evidence." (ECF No. 14 at 3 (emphasis deleted).) As part of the RFC assessment, the ALJ must evaluate a claimant's "statements and symptoms regarding the limitations caused by her impairments." *Linares v. Colvin*, No. 5:14-cv-00120, 2015 WL 4389533, at *5 (W.D.N.C. July 17, 2015) (citing 20 C.F.R. §§ 404.1529, 416.929; *Craig*, 76 F.3d at 593–96). To that end, a claimant's symptoms "must be supported by objective medical evidence showing the existence of a medical impairment

which could reasonably be expected to produce the [symptoms], in the amount and degree, alleged by the claimant." *Johnson*, 434 F.3d at 657 (quoting *Craig*, 76 F.3d at 591). Essentially, the ALJ "must assess whether the claimant's subjective symptom statements are consistent with the record as a whole." *Vass v. Berryhill*, No. 7:17-cv-87, 2018 WL 4737236, at *6 n.4 (W.D. Va. June 12, 2018), *adopted by* 2018 WL 4704058 (W.D. Va. Sept. 30, 2018).

In performing this evaluation in this case, the ALJ first summarized Claimant's hearing testimony, noting that Claimant testified "she would not be a productive employee" because "she does not get along well with others" and "stays confused, is very forgetful, unable to focus, and has constant crying spells." (Tr. at 52.) The ALJ also noted that Claimant "indicated when she lost her job her behavior had changed." (*Id.*) With respect to Claimant's daily activities, the ALJ remarked that Claimant testified that "she used to have hobbies and perform chores but not [sic] her daughter does the household chores" and "her husband picks up dinner or makes simple meals" while Claimant "stays in bed a lot." (*Id.*) The ALJ further remarked that Claimant "indicated her medications cause side effects that affect every part of her life." (*Id.*) But the ALJ found that Claimant's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.*)

The ALJ then addressed the objective medical evidence in the record, remarking, "The objective findings do not corroborate the allegations to the disabling extent as asserted by Claimant." (*Id.* at 53.) He reviewed her mental health treatment records[5] and

---

[5] Because the arguments in Claimant's brief relate to her alleged mental impairments (ECF No. 11 at 9–11), the undersigned has not addressed here the ALJ's findings with regard to her alleged physical impairments.

observed that Claimant reported that she "had a very difficult time" during 2015 and eventually lost her job, and her mental health provider adjusted her medications several times. (*Id.* at 53–54.) The ALJ suggested that these adjustments resulted in improvements to Claimant's symptoms. (*Id.* at 54.) The ALJ also remarked that although Claimant "reported increased symptoms . . . her mental status examinations were essentially normal." (*Id.*) He further observed that Claimant twice told her provider that she had gone on vacation that year. (*Id.*) In addition, the ALJ summarized the findings from Dr. Nutter's consultative examination of Claimant conducted on November 16, 2015, which indicated that Claimant "appeared manic" but her mental status examination was normal, and the evaluator "did not indicate limitation in social functioning." (*Id.*)

Moving on to Claimant's treatment records from late 2015 and 2016 with different mental health providers, the ALJ observed that Claimant reported experiencing symptoms of depression and bipolar disorder and that her medications were adjusted several times. (*Id.* at 54–55.) By the end of 2016, the ALJ noted, Claimant told Dr. Robertson, her psychiatrist, that her "medication was helping and she even went on family [sic] trip to the beach over Thanksgiving." (*Id.* at 55.) The ALJ further noted that despite "depressed" moods, Claimant's mental status examinations were normal, including the findings relating to her memory and concentration. (*Id.* at 54–55.) He remarked that Ms. Hersman, Claimant's counselor, "indicated [Claimant's] depression appeared to be only mild to moderate." (*Id.* at 54.)

After reviewing this evidence, the ALJ summarized, "Restricting [Claimant] to performing the range of work [outlined in the RFC assessment] adequately addresses the location, duration, frequency and intensity of her alleged symptoms as well as precipitating aggravating factors." (*Id.* at 55.) The ALJ noted that Claimant's alleged side

effects from her medications "are mild and would not interfere with [her] ability to perform work activities in any significant manner." (*Id.*) And the ALJ observed that Claimant's "activities are not markedly limited" and remarked that Claimant was able to care for herself, prepare meals, pay bills, clean, and travel. (*Id.*)

Finally, the ALJ summarized the available opinion evidence. (*Id.* at 55–56.) In giving "partial weight" to the opinions of Claimant's treating mental health providers, Dr. Robertson and Ms. Autrey, the ALJ explained that their opinions "are not consistent with treatment records and psychological testing which consistently indicate good memory, good concentration, and that she interacted well with others. . . . There is no evidence to support more than mild limitations in memory or concentration or more than moderate limitations in concentration [sic]." (*Id.* at 55.) In according "little weight" to the opinion of psychological evaluator Dr. Steward, the ALJ stated, "The record does not support permanent [sic] or totally disabled, as it is internally inconsistent with the objective testing, which showed above average intelligence, good ability to concentration [sic], and no significant deficits in memory." (*Id.* at 56.) And in assigning "little weight" to the opinions of the state agency psychological consultants, Dr. Bickham and Dr. Richard, the ALJ explained that "there is no objective evidence to support [that Claimant] is limited to simple work" because "[o]n mental status examinations and during psychological testing [Claimant] exhibited no significant limitations," she "reported she is able to follow instructions," and "during the hearing, the [ALJ] observed no difficulties with concentration." (*Id.*) The ALJ then concluded, "In summary, [Claimant's] subjective complaints and alleged limitations are not fully persuasive and the record as a whole establishes that she retains the capacity to perform work activities with limitations as set forth [in the RFC assessment]." (*Id.*)

The ALJ's evaluation of Claimant's subjective complaints about her symptoms complies with the governing regulations and case law, is adequately explained, and is supported by substantial evidence.  The ALJ clearly considered Claimant's statements in light of the record, and Claimant's assertion that he "made only two references to credibility" (ECF No. 11 at 11) ignores the fact that in between the two passages Claimant cites, the ALJ engaged in a thorough review of the objective medical evidence that culminated in his finding that Claimant's subjective statements about her symptoms were not consistent with that evidence.  (Tr. at 52–55.)  "[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the abilities to perform work related activities . . . ."  SSR 16-3p, 2017 WL 5180304, at *5 (Oct. 25, 2017).  Further, to the extent Claimant argues that the ALJ erroneously considered her activities of daily living as part of his evaluation (ECF No. 11 at 11), her argument is without merit, as the applicable regulations expressly instruct the ALJ to consider the claimant's "daily activities."  20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i).  And her argument that the ALJ "did not identify any testimony that was inconsistent with the medical evidence" (ECF No. 14 at 3) likewise fails because the ALJ's extensive discussion of Claimant's mental health treatment records reveals that her mental status examinations did not reflect her testimony.  (*See* Tr. at 53–55.)  As such, the undersigned **FINDS** that the ALJ properly evaluated Claimant's subjective statements about her symptoms.

C. *Opinion Evidence*

Claimant contends that the ALJ improperly weighed all of the medical opinion evidence in this case.  (ECF No. 11 at 12–17.)  When evaluating medical opinions, this Court considers, among other factors, "(1) whether the physician has examined the

applicant; (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654 (citing 20 C.F.R. § 404.1527). Generally, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 590). But "a treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Id.* (citing 20 C.F.R. § 416.927).

1. *Dr. Nutter*

Claimant first argues that the ALJ improperly gave "significant weight" to Dr. Nutter's consultative examination. (ECF No. 11 at 13.) She appears to suggest that the findings of the consultative examination do not constitute a "medical opinion" and thus the ALJ should not have weighed them at all. (*See id.*) *But see Neice v. Colvin*, No. 7:14-cv-00024, 2015 WL 1169216, at *4–*5 (W.D. Va. Mar. 13, 2015) (adopting report and recommendation of magistrate judge, which recommended remand because ALJ did not weigh consultative examination).

More to the point, however, Claimant asserts that the weight the ALJ assigned to Dr. Nutter's findings is inconsistent with the ALJ's determination that Claimant's right shoulder rotator cuff tendonitis was severe. (*Id.*) But Dr. Nutter's findings—*i.e.*, that Claimant "exhibited some tenderness of the right shoulder and elbow but . . . her range of motion was only a little decreased" (Tr. at 53, *see id.* at 477)—are similar to the contemporaneous findings of Dr. Crews and Mr. Southers (*id.* at 53; *see id.* at 484, 503).

The ALJ acknowledged this similarity by according "significant weight" to Dr. Nutter's findings because they were "supported by the objective findings" the ALJ went on to describe in the next paragraph of his written opinion. (Tr. at 53.) The ALJ's continued review of the medical evidence relating to Claimant's right shoulder rotator cuff tendonitis led him to conclude that Claimant "is capable of performing medium exertion with reaching limitation." (*Id.*) Due to this limitation, it was not unreasonable for the ALJ to conclude that Claimant's right shoulder rotator cuff tendonitis constituted a "severe" impairment. *See Brown v. Comm'r*, 873 F.3d 251, 254 (4th Cir. 2017) (defining "severe" impairment as one "that significantly limits the claimant's physical or mental ability to perform basic work activities"). Nothing about the ALJ's treatment of Dr. Nutter's consultative examination findings indicates that the ALJ improperly considered those findings.

### 2. *Ms. Jennings*

Claimant makes essentially the same argument with respect to the weight the ALJ gave to the findings of consultative examiner Ms. Jennings. (ECF No. 11 at 13–14.) The ALJ accorded "significant weight" to Ms. Jennings's findings because they were "supported by mental status examination." (Tr. at 54.) He summarized those findings accurately, noting that Ms. Jennings stated that Claimant "appeared manic" and "complained of problems with concentration" but had normal memory and focus upon mental status examination. (*Id.*; *see id.* at 471–72.) The ALJ also stated that Ms. Jennings "did not indicate limitation in social functioning," which correctly reflects Ms. Jennings's evaluation notes. (*Id.* at 54, 472.)

Still, Claimant asserts that "in light of the overwhelming medical evidence in this record and [Claimant's] longstanding mental health treatment, the ALJ missed the

significance of [Ms. Jennings's] more disturbing observations about [Claimant's] behavior and pressured speech." (*Id.* at 14.) Ms. Jennings indeed observed that Claimant's speech was "quite pressured in nature" and that "[s]he spoke quite rapidly and was quite emotional." (Tr. at 471.) Ms. Jennings also noted that Claimant "appeared quite anxious as evidenced by facial expressions and trembling." (*Id.* at 472.) But again, despite these observations, Ms. Jennings's mental status examination of Claimant was— as the ALJ described—normal. (*Id.* at 54, 471–72.) Moreover, Ms. Jennings reviewed Claimant's previous mental health treatment records as part of her evaluation of Claimant and considered those records in making her diagnoses. (*Id.* at 470, 472.) At its core, Claimant's argument amounts to a disagreement with the way the ALJ resolved conflicts in the evidence, which is the exclusive province of the ALJ. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996) (citing *Kasey v. Sullivan*, 3 F.3d 75, 79 (4th Cir. 1993)).

### 3. *Dr. Robertson and Ms. Autrey*

Next, Claimant argues that the ALJ erred by assigning "partial weight" to Dr. Robertson's and Ms. Autrey's interrogatory responses, which opined that Claimant satisfied three mental impairment Listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. (ECF No. 11 at 14–15; *see* Tr. at 641–44.) As an initial matter, their opinions relating to the Listings are not entitled to the controlling weight generally afforded to treating physicians because whether "the plaintiff has an impairment that 'meets or is equivalent in severity to the requirements of a listing . . . is an opinion on an issue reserved to the Commissioner.'" *Newsome v. Astrue*, No. 9:09-cv-2859-DCN-BM, 2011 WL 902463, at *3 (D.S.C. Mar. 15, 2011) (quoting SSR 96-8p, 1996 WL 374185, at *7 n.8 (July 2, 1996)); *see Hart v. Colvin*, No. 5:16-cv-32, 2016 WL 8943299, at *5 (N.D.W. Va. Sept. 14, 2016)

(citing SSR 96-5p, 1996 WL 374183 (July 2, 1996)), *adopted by* 2016 WL 6581293 (N.D.W. Va. Nov. 7, 2016).

Claimant also asserts that the ALJ failed to "identify . . . with specificity" the portions of the record on which he relied in rejecting the opinions of Dr. Robertson and Ms. Autrey. (ECF No. 11 at 14.) To the contrary, the ALJ stated, "I give only partial weight to the opinions . . . as they are not consistent with treatment records and psychological testing which consistently indicate good memory, good concentration, and that [Claimant] interacted well with others." (Tr. at 55.) In addition, the ALJ mentions Claimant's reports that she was "able to follow instructions" and traveled to the Great Smoky Mountains and to the beach. (*Id.*) The ALJ cited to several exhibits in support of these statements (*id.*), all of which he discussed in his review of the medical evidence in the record (*id.* at 54–55). For example, the ALJ referenced Dr. Robertson's treatment notes from 2016 and 2017, which the ALJ had already explained revealed that although Claimant reported experiencing symptoms of mental illness, "her mental status examinations were consistently normal." (*Id.* at 55.) Therefore, the ALJ adequately identified "which evidence [he] found credible and why" and applied "the pertinent legal requirements to the record evidence" when evaluating the opinions of Dr. Robertson and Ms. Autrey. *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (explaining substantial evidence review). And the ALJ was entitled to reject those opinions insofar as they were "inconsistent with both [Dr. Robertson's] own treatment notes and some of the other medical evidence in the record." *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015); *see id.* at 267 ("An ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged

up specious inconsistencies or has failed to give a sufficient reason for the weight afforded a particular opinion." (internal quotation marks and citations omitted)).

Further, as to Claimant's argument that "[i]t was bazaar [sic] to pretend that one's going on vacation somehow refuted expert medical opinions as to the extent and severity of a mental impairment" (ECF No. 11 at 15), numerous courts, including the Fourth Circuit Court of Appeals, have held that the ALJ is entitled to consider such evidence. *Agee v. Chater*, 100 F.3d 950 (4th Cir. 1996) (table), 1996 WL 654375, at *1 (holding that ALJ properly rejected opinion as inconsistent with claimant's "own actions," which included taking "a tour bus vacation"); *see Thomas v. Berryhill*, No. 3:17-cv-00067-FDW, 2018 WL 1431746, at *4 (W.D.N.C. Mar. 22, 2018) (upholding ALJ's evaluation of severity of claimant's mental impairments where ALJ relied on "evidence that Plaintiff went on multiple family vacations"); *Olenick v. Astrue*, No. 3:11-cv-1359-JMC-JRM, 2012 WL 3843858, at *8 (D.S.C. July 31, 2012) (affirming ALJ's finding that claimant "had no limitations in activities of daily living" in part because he "travel[ed] to another state for a ten-day vacation"), *adopted by* 2012 WL 3843737 (D.S.C. Sept. 4, 2012).

    *4. Dr. Steward*

Claimant asserts that the ALJ improperly assigned "little weight" to the opinions of Dr. Steward, a psychologist who evaluated Claimant at Dr. Robertson's request, on the bases that Dr. Steward "lacked 'program knowledge'" and that his report included "minimal objective evidence." (ECF No. 11 at 15.) As to the former argument, a medical source's "program knowledge" is a factor the ALJ may consider when evaluating opinion evidence. *See Ahmad v. Berryhill*, No. 1:17-cv-1393 (IDD), 2019 WL 1233854, at *11 (E.D. Va. Mar. 15, 2019) (concluding that ALJ properly evaluated opinion evidence where he "reasoned that the Consultants explained their opinion thoroughly using program

43

knowledge, professional expertise, and available evidence"); *see also Lyde v. Saul*, No. 7:18-cv-134-KS, 2019 WL 4491503, at *8 (E.D.N.C. Sept. 18, 2019) (determining that RFC finding supported by substantial evidence where ALJ "gave great weight to the state-agency psychological consultants . . . because he found their opinions to be 'well supported by the evidence of record and . . . based on the consultants' expertise and program knowledge'"). Accounting for a medical source's knowledge of Social Security Administration procedures is especially appropriate in a case such as this, where the medical source has opined that the claimant is "permanently and totally disabled." (Tr. at 569.) Although such an opinion "is never entitled to controlling weight or special significance" because it relates to "an issue reserved to the Commissioner," the ALJ is nonetheless obligated to "carefully consider[]" it. *Bonner v. Colvin*, No. 5:15-cv-03332, 2016 WL 4408831, at *10 (S.D.W. Va. July 27, 2016) (quoting SSR 96-5p, 1996 WL 374183 (July 2, 1996), *adopted by* 2016 WL 4411505 (S.D.W. Va. Aug. 16, 2016).

Nor did the ALJ err by discounting Dr. Steward's opinion because it "included minimal objective evidence." (Tr. at 56.) As the ALJ explained, many of Dr. Steward's conclusions were based on information Claimant self-reported, as opposed to objective testing, and the objective testing Dr. Steward performed "showed above average intelligence, good ability to concentration [sic], and no significant deficits in memory." (*Id.*) The ALJ found these results "internally inconsistent" with Dr. Steward's assertion that Claimant was unable to work. (*Id.*) This is an acceptable reason to reject opinion evidence. *Jones v. Berryhill*, 681 F. App'x 252, 256 (4th Cir. 2017); *Nicholson v. Comm'r*, 600 F. Supp. 2d 740, 753 n.1 (N.D.W. Va. 2009) ("[O]pinions by medical doctors which are internally inconsistent . . . are entitled to little or no weight." (citing 20 C.F.R. § 416.927(c)(2), (d)(4))).

### 5. *Dr. Binder and Dr. Withrow*

Claimant next argues that the ALJ should have accorded "no weight," rather than "partial weight," to the opinions of state-agency medical consultants Dr. Binder and Dr. Withrow. (ECF No. 11 at 15–16.) As the ALJ pointed out, Dr. Binder and Dr. Withrow found that Claimant had no physical impairments that rose to a severe level and, correspondingly, that she had no exertional or non-exertional physical limitations. (Tr. at 56, 109, 126.) But the ALJ did not fully credit their opinions because "evidence received subsequent to their review supports" a finding that Claimant's "right shoulder rotator cuff tendinitis is severe." (*Id.* at 56.) In other words, the ALJ concluded that Claimant's right shoulder rotator cuff tendonitis "cause[d] more than minimal limitations in [her] ability to perform basic work activities." (*Id.* at 50.) However, the ALJ indicated that he agreed with Dr. Binder's and Dr. Withrow's opinions insofar as they were consistent with "the objective evidence and [Claimant's] conservative treatment," which suggested that Claimant "is able to perform medium exertion with reaching limitation." (*Id.* at 56.) Thus, the ALJ adequately explained his reasons for giving "partial weight" to those opinions. *See Carr v. Berryhill*, No. 2:15-cv-16513, 2017 WL 1050577, at *4 (S.D.W. Va. Mar. 20, 2017) (stating that ALJ sufficiently explains weight accorded to medical opinions when "a subsequent reviewer is able to understand the weight given to those opinions and the reasons for that weight" (quoting *Tucker v. Astrue*, 897 F. Supp. 2d 448, 468 (S.D.W. Va. 2012))).

### 6. *Dr. Bickham and Dr. Richard*

Lastly, Claimant asserts that the ALJ insufficiently explained his rejection of the opinions of state-agency psychological consultants Dr. Bickham and Dr. Richard that Claimant "had moderate difficulties in maintaining concentration, persistence, or pace"

and improperly substituted "his own assumed expertise" against that of Dr. Bickham and Dr. Richard in rejecting their suggested "simple-step" limitation.  (ECF No. 11 at 16–17.) Dr. Bickham opined that Claimant was "[m]oderately limited" in her abilities to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and carry out her work at a consistent pace without interruptions from psychologically based symptoms or unreasonably lengthy breaks.  (Tr. at 110–11.)  Given these findings, Dr. Bickham concluded that Claimant "retains the ability to learn and perform routine one to three task work like activities." (*Id.* at 112.) Dr. Richard affirmed Dr. Bickham's opinions.  (*Id.* at 129.)

The ALJ gave "little weight" to their opinions because "there no [sic] objective evidence to support [that Claimant] is limited to simple work." (*Id.* at 56.) He continued, "On mental status examinations and during psychological testing [Claimant] exhibited no significant limitations," she "reported she is able to follow instructions," and "during the hearing, the [ALJ] observed no difficulties with concentration."  (*Id.*)  In support of that statement, the ALJ cited to record evidence that he had previously discussed at length. (*Id.*)  This explanation belies Claimant's argument that the ALJ offered no more than "naked assertions lacking specificity."  (ECF No. 11 at 16.)    Moreover, Claimant's contention that the ALJ's use of record evidence to refute medical source opinions is "actually pitting his own assumed expertise against that of two psychologists" (ECF No. 11 at 17) is nonsensical in light of the ALJ's duty to evaluate opinion evidence.  *See Hubbard v. Astrue*, No. 3:10-cv-01132, 2011 WL 3629198, at *11 (S.D.W. Va. July 29, 2011) ("If the medical opinions are inconsistent, either internally or with other opinions or evidence in the record, the ALJ will weigh the evidence, including the medical opinions, to determine whether a decision can be made on the Claimant's alleged disability using

only the information in the record."), *adopted by* 2011 WL 3629187 (S.D.W. Va. Aug. 17, 2011). And to the extent Claimant argues that the ALJ is not permitted to consider his observations of Claimant during the hearing, the ALJ may do so "in conjunction with the record as a whole." *Robinson v. Colvin*, No. 5:14-cv-2391-KDW, 2015 WL 5008769, at *14 (D.S.C. Aug. 20, 2015); *see Smith v. Berryhill*, No. 3:17-cv-612, 2018 WL 3747287, at *6 (W.D.N.C. Aug. 7, 2018) ("[T]he court finds no problem with the ALJ incorporating her own observations at the hearing into her decision."). The ALJ did not exclusively rely on his observations to the exclusion of other record evidence, and he previously noted that treatment notes and objective testing revealed a good ability to concentrate. (*See* Tr. at 55–56.)

Accordingly, the undersigned **FINDS** that the ALJ properly weighed the medical opinion evidence in this case.

### D. VE Testimony

Claimant argues that the ALJ should have relied on the VE's testimony that no work would exist for a hypothetical individual who was off-task for at least 15% of the workday because Claimant's former employer indicated that Claimant's productivity "was 70% of that of other employees." (ECF No. 11 at 17–18; *see* Tr. at 244–45.) In determining whether a claimant can perform his or her past relevant work or adjust to other work, the ALJ may engage a VE to "offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s)" can perform certain work. 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2); *see id.* §§ 404.1560(c), 416.960(c). "In order for a [VE's] opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which

fairly set out all of claimant's impairments." *Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006) (quoting *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989)).

"[A] hypothetical question is unimpeachable if it adequately reflects a [RFC] for which the ALJ had sufficient evidence." *Fisher v. Barnhart*, 181 F. App'x 359, 364 (4th Cir. 2006) (citing *Johnson*, 434 F.3d at 659) (emphasis deleted) (internal quotation marks omitted). But "an ALJ is permitted to ask a VE multiple hypotheticals, even if they are contradictory, as such hypothetical questions are not findings of fact, and it is entirely permissible for the ALJ to determine after the hearing which hypothetical is supported by the record." *Woodlief v. Berryhill*, No. 5:16-CV-191-FL, 2017 WL 9478528, at *5 (E.D.N.C. Aug. 4, 2017) (citing *Davis v. Apfel*, 162 F.3d 1154 (4th Cir. 1998) (table), 1998 WL 559728, at *2; *Sizemore v. Colvin*, No. 5:15-CV-00053-MOC, 2016 WL 483140, at *4 (W.D.N.C. Feb. 5, 2016)). The ALJ need not rely on VE testimony that relates to impairments the ALJ determines to be "not severe or not credible." *See McPherson v. Astrue*, 605 F. Supp. 2d 744, 761 (S.D.W. Va. 2009).

Claimant's argument is not so much that the ALJ asked an improper question to the VE; rather, she appears to assert that the ALJ should have adopted the alleged limitations in the questionnaire submitted by Claimant's former employer. (ECF No. 11 at 18; ECF No. 14 at 5–6.) As an initial matter, to the extent Claimant contends that the ALJ should have conspicuously addressed the questionnaire in his written decision, the ALJ is "not required to specifically discuss and analyze every piece of evidence in the case in [his] narrative opinion[] so long as it is possible for the reviewing court to realize that all relevant evidence was considered, though not written about, in reaching the ultimate decision." *Marshall v. Astrue*, No. 8:11-cv-02806-RBH, 2013 WL 1194764, at *4 (D.S.C. Mar. 21, 2013) (quoting *Mellon v. Astrue*, No. 4:08-2110-MB S-TR, 2009 WL 2777653, at

48

*13 (D.S.C. Aug. 31, 2009)).  The ALJ's written decision is replete with discussion of other record evidence that the ALJ explained indicated that Claimant had above average mental functioning and normal memory and concentration abilities.  (*See* Tr. at 51, 53–56.)  The evidence the ALJ chose to discuss is consistent with Claimant's former employer's representations on the same questionnaire that Claimant "complete[s] all the usual duties required for [her] position," is "able to complete all of [her] job duties without special assistance," and "complete[s] [her] work in the same amount of time as [other] employee[s] in similar positions."  (Tr. at 244.)  As such, the undersigned **FINDS** that the ALJ was not required to rely on the questionnaire and the VE's testimony to conclude that Claimant was disabled.

### E.  *New Evidence Presented to Appeals Council*

Finally, Claimant argues that the Appeals Council erred by not remanding this matter to the ALJ in the face of additional interrogatory answers from Dr. Robertson and Ms. Autrey and updated physical therapy records related to Claimant's right shoulder rotator cuff tendonitis.  (ECF No. 11 at 18–20.)  To the extent Claimant challenges the Appeals Council's denial of her request for review, the denial itself is not reviewable under 42 U.S.C. § 405(g).  *See Smith v. Berryhill*, 139 S. Ct. 1765, 1773 (2019) (explaining that § 405(g) permits judicial review of "final decision"); *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000) (noting that when Appeals Council "denies the request for review, the ALJ's opinion becomes the final decision" of Commissioner); *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011) (explaining that Appeals Council does not make "decision" under applicable regulations when it denies request for review).  Instead, this Court, taking into account the newly submitted evidence considered by the Appeals Council, reviews the ALJ's decision for substantial evidence, just as it would do when no additional evidence

is submitted. *See Meyer*, 662 F.3d at 707; *Flesher v. Colvin*, No. 2:14-cv-30661, 2016 WL 1271511, at *9 (S.D.W. Va. Mar. 31, 2016) (quoting *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (en banc)). In doing so, this Court "focus[es] on determining whether [the] new evidence is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports." *Flesher*, 2016 WL 1271511, at *9 (internal quotation marks omitted). Remand is appropriate only if the newly submitted evidence "impugn[s] the integrity of the [ALJ's] decision." *Meyer v. Colvin*, 754 F.3d 251, 257 (4th Cir. 2014).

At their core, Claimant's arguments are challenges to the ALJ's fact-finding. (*See* ECF No. 11 at 18–20.) To that end, she submitted an additional set of interrogatories to Dr. Robertson and Ms. Autrey with questions directed at refuting the ALJ's evaluations of Dr. Steward's opinions and Ms. Jennings's examination findings. (Tr. at 8–13.) But as the Commissioner points out (ECF No. 13 at 18) and as the undersigned has explained, the ALJ properly evaluated the record evidence from Ms. Jennings and Dr. Steward. Because the ALJ explained his reasons for the weight he accorded to their opinions and to their findings, and those reasons were supported by substantial evidence, there seems little need for this matter to be remanded in order for the ALJ to consider the additional opinions of Dr. Robertson and Ms. Autrey—providers whose opinions the ALJ assigned only "partial weight"—about the deficiencies in his initial decision. In other words, the additional interrogatory responses "do[] not undermine the substantial evidence supporting the ALJ's decision." *Kiser v. Colvin*, No. 1:14-cv-325-RJC-DSC, 2016 WL 884690, at *3 (W.D.N.C. Mar. 8, 2016).

Claimant also submitted additional physical therapy records that she asserts "confirm that there had been no improvement and, in fact, [Claimant's] shoulder

condition was worsening because she was afraid to use it." (ECF No. 11 at 19 (citing Tr. at 15–41).) The Appeals Council declined to consider this evidence because it was dated after the ALJ's decision. (Tr. at 2.) Indeed, the records Claimant cites, which date from January 8, 2018, until March 2, 2018, have no bearing on whether Claimant was disabled prior to the ALJ's December 22, 2017 decision. *See Reichard v. Barnhart*, 285 F. Supp. 2d 728, 733 (S.D.W. Va. 2003) ("[E]vidence must be considered if it has any bearing upon whether the Claimant was disabled during the relevant period of time."); *see Verimlyea v. Berryhill*, No. , 2019 WL 456238, at *2 (M.D.N.C. Feb. 5, 2019) ("[T]he relevant inquiry is if the contents of the proffered evidence concern the period on or before the ALJ's decision."). Specifically, Claimant's progress in physical therapy—or lack thereof—after the ALJ's decision does not affect the ALJ's ultimate conclusion that prior to December 22, 2017, Claimant was "capable of performing medium exertion with reaching limitation" because she underwent conservative treatment for her right shoulder rotator cuff tendonitis and elected not to pursue surgery. (Tr. at 53.) Moreover, the earlier records that were before the ALJ when he made his decision reflected Claimant's complaints that her shoulder pain was worsening because she did not use her arm. (*Id.* at 618, 632.) Accordingly, the undersigned **FINDS** that remand to consider the additional evidence is not required.

## IV.    *CONCLUSION*

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 11), **GRANT** the Commissioner's request to affirm his decision (ECF No. 13), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable David A. Faber, Senior United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Faber.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: January 2, 2020

Dwane L. Tinsley
United States Magistrate Judge